UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

     v.                                                                        Criminal No. 05-0366 (JGP)

**DARRICK NAPPER**

**MEMORANDUM ORDER**

The defendant is charged in a second Superseding Indictment, filed on March 23, 2006, with (1) conspiracy, (2) unlawful possession with intent to distribute five grams or more of cocaine base, (3) simple possession of a controlled substance, (4) using, carrying and possessing a firearm during a drug trafficking offense, and (5) unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year[1]. The case is now before the Court on the defendant's **Motion To Suppress Tangible Evidence** [#12].

---

[1] The defendant was arrested on August 4, 2005. On October 3, 2005, an Information was filed, in which the defendant was charged with using, carrying and possessing a firearm during a drug trafficking offense and unlawful distribution of a controlled substance. The information was filed pursuant to a proposed plea agreement. The case was referred to this Court on October 6, 2005 for a plea. The defendant appeared before the Court on October 14, 2005 at which time he made an oral motion for the appointment of new counsel. Although the Court found no fault with the representation of his first counsel, the Court granted the motion since it appeared there were irreconcilable differences between counsel and client. The Court ordered the appointment of new counsel. Attorney Elita Amato was appointed to represent him and arraignment was scheduled for November 16, 2005. A superseding indictment (actually the first indictment) was filed on November 8, 2005 charging him with simple possession of a controlled substance, unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, unlawful possession with intent to distribute five grams or more of cocaine base, and using, carrying and possessing a firearm during a drug trafficking offense. At that time he entered a plea of not guilty, and a status hearing was scheduled for December 15, 2005. The motion to suppress tangible evidence was filed on December 19, 2005 [#12]. The defendant filed a motion for an extension of time to respond to the government's opposition. The Court held an evidentiary hearing on February 9, 2006 and heard the testimony of arresting officers Alvarado and McFadden and the defendant. The hearing was then continued to March 3, 2006, at the defendant's request, to allow the defendant's counsel and investigator to locate a potential witness. The hearing was again continued to March 24, 2006, and the second Superseding Indictment was filed on March 23, 2006.

I

The underlying facts as testified to by the officers are as follows: On August 4, 2005, officers Erick Alvarado and Dino McFadden of the Drug Interdiction Unit were on duty at the Greyhound Bus Terminal at 1005 First Street, Washington, D.C., where they were conducting "drug interdiction interviews." Tr. at 6, 74. Both were dressed in plain clothes with no visible evidence that they were members of the Metropolitan Police Department. Tr. at 7, 74. They had positioned themselves inside the terminal so they could watch the arrival of a Carolina Trailways bus arriving from Philadelphia and continuing on south. Tr. at 7-9, 78. When the bus arrived they watched passengers exiting the bus at the outside platform on the south side of the terminal. Tr. at 7. McFadden directed Alvarado's attention to the defendant. Tr. at 78. There was nothing unusual about the defendant's dress. Tr. at 109. After the defendant exited the bus, he did not enter the terminal as did most passengers but rather walked along the south platform toward a smoking area located at the southeast corner of the terminal. Tr. at 7-8, 63-64. The defendant did not stop at that smoking area but continued around the corner to the east platform. Tr. at 44-45. The officers continued to follow him from the inside of the terminal. Tr. at 8. Alvarado exited the station and approached the defendant. McFadden followed Alvarado out of the terminal but remained some distance away. Tr. at 18, 93. Alvarado called to the defendant and asked whether he could speak to him. The defendant responded "Yeah." Tr. at 47. Alvarado identified himself as a police officer and showed the defendant his identification, but not his badge. *Id.* Alvarado's tone throughout was conversational. Alvarado asked the defendant whether he had "deboarded" one of the buses that had just arrived. The defendant responded "No." *Id.* Alvarado asked the defendant why he was on the platform and the defendant responded that he was waiting for someone. *Id.* The officer

asked whether he had any identification and the defendant replied "No". Tr. at 17. When asked whether he lived in the District of Columbia, the defendant responded in the affirmative. The officer advised the defendant that he was a member of the Drug Interdiction Unit and that they "talk to people coming to the city of Washington, D.C. to check out to see if they're carrying any kind of contraband." *Id.* The defendant said "All right." *Id.* The officer then asked the defendant whether he was carrying any weapons of "mass destruction." *Id.* The defendant responded "No." *Id.* Alvarado then asked the defendant whether the defendant would give him permission to search the bag he was carrying. *Id.* The defendant said "Yeah" and handed the bag to Alvarado. Tr. at 18. The officer took the bag and placed it on the floor and kneeled down to begin the search. At the same time, McFadden, who had been standing away from Alvarado, approached to watch the defendant while Alvarado knelt to begin his search. Alvarado opened the bag and saw clothing. He removed the clothing and "immediately saw a box which [he] recognized as . . . ammunition." *Id.* He opened the box and saw "casings" which indicated to him that there was ammunition inside. Tr. at 19. He gave a code word to advise McFadden that he was placing the defendant under arrest. McFadden, who had been talking to the defendant, immediately "bear-hugged" him and called out to Alvarado, "He's got a burner." *Id.* "Burner is a common lingo on the street for a gun." *Id.* Alvarado stood up and placed handcuffs on the defendant and McFadden reached into the defendant's waist band and pulled out a semiautomatic pistol. Tr. at 18-19. The weapon was a .9 millimeter Ruger semiautomatic loaded with ten rounds of .380 ammunition. *Id.* A further search of the defendant revealed a canvas holster with a pouch which contained an additional magazine loaded with ten rounds of .9 millimeter ammunition. Tr. at 20. The officers also found on the defendant's person two ziplock plastic bags which in turn contained smaller bags containing a

"rock-like substance." The total number of small bags was 43. *Id*. A further search revealed a plant material which field-tested positive for THC. A further search of his person turned up four live rounds of .9 millimeter ammunition. Tr. at 21. The officers found a second semiautomatic pistol in the bag which was loaded with eight rounds of ammunition, a bullet resistant vest, a digital scale and ski masks. *Id*.

The defendant testified and his version of the facts is substantially different. He testified that he was going from Baltimore, Maryland to Atlanta, Georgia. He stated that since he did not have identification, he had a ticket in the name of Kim Keys. Tr. at 114-15. According to his testimony, when the bus arrived in Washington, he got off the bus and went toward the smoking area which was outside the terminal at the southeast corner of the platform. He then walked toward a smoking area on the east platform. Tr. at 117-19. He stated that he had been smoking no more than a minute when the officers approached him. Tr. at 119. Accepting his version of the facts for a moment, it appears that he saw both officers *before* he started to smoke. According to him, he saw them before they exited the terminal. Tr. at 120. He admitted that the officer asked him whether he had just gotten off of the bus and that he stated that he had not. Tr. at 121-22. He testified that when he asked him why he was at the station, he answered that he was waiting for someone. Tr. at 122. The officers asked him whether he had guns or drugs on him and he stated he did not. *Id*. He testified that he was not trying to cooperate with the officer. *Id*. He stated that the officer asked him whether the officer could search his bag and that he "had no answer." Tr. at 123. According to him, the officer "reached for [his] bag . . . with his right hand." *Id*. At the time the bag was on the defendant's left shoulder. When asked by his counsel what the defendant did at that point, he stated that the officer "gestured for [him] to hand over the bag to him." *Id*. He testified that, "I thought

4

I had no other choice but to hand it over to him." *Id.* He admitted that he did not want the police to find the items in the bag. Tr. at 124. The defendant was then placed under arrest.

II

The defendant moves to suppress the tangible evidence recovered by the officers on the grounds that (1) the police conducted an illegal *Terry* stop, (2) the search cannot be justified as a search incident to an arrest in that it was a warrantless search "which per se is 'unreasonable under the Fourth Amendment'", and (3) that defendant did not consent to the search. The Court need not discuss the first two grounds cited by the defendant because the government does not argue that the search was made pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) or that the officers had probable cause to search the defendant. The government relies on its contention that the defendant voluntarily gave his consent for the officers to search his bag.

The defendant argues that he did not respond when the Alvarado asked whether he could search the defendant's bag. He testified that the officer motioned to him to hand over the bag. He contends that he did not give the officers consent to search the bag. On the other hand, Alvarado testified that when he asked the defendant whether he could search the bag, the defendant responded, "Yeah." After giving careful consideration to the testimony of the officers and the defendant, the Court finds by a preponderance of the evidence that the defendant responded "Yeah" to the officer's question and that the defendant did consent to the search. But the inquiry does not end there. The next question is whether the consent was given voluntarily. While continuing to maintain that he did not give consent, the defendant also argues that he felt he had no other choice. In support of this argument, the defendant cites two cases, *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999) and *United States v. Gregory Stewart*, Criminal No. 05-159 (PLF) (D.D.C., Sept. 16,

2005). The Court finds both cases distinguishable.

In *Worley*, the defendant was approached at an airport by two officers dressed in plain clothes who were assigned to the Drug Interdiction Unit. Their attention was drawn to Worley because they felt that a bag he was carrying was "out of the ordinary." 193 F. 3d at 382. They approached Worley and asked him whether the bag belonged to him and inquired about the contents. Worley answered that the bag contained items he purchased from a gift shop. One of the officers then asked whether he could look in the bag, to which Worley responded "[Y]ou've got the badge, I guess you can." *Id.* at 383. A search of the bag revealed methamphetamine. The District Court granted a motion to suppress and a divided Court of Appeals affirmed. The government argued that Worley had consented to the search. The court noted that the government had the burden of proof to show by a preponderance of the evidence that Worley voluntarily consented to the search. The court examined the totality of the evidence in reaching its decision, but there is little doubt that a controlling factor was Worley's statement that, "You've got the badge, I guess you can." As the court stated, "the government must also establish that Worley's statement . . . was an unequivocal statement of free and voluntary consent, not merely a response conveying an expression of futility in resistance to authority or acquiescing in the officer's request." *Id.* at 386. Here, the Court has found that the officer asked a question and the defendant responded "Yeah" without anything else. After responding in the affirmative, the defendant handed the bag to Alvarado without comment.

The facts in *Stewart* are also distinguishable. That case also involved a defendant who arrived at the same bus station and was approached by Officer McFadden, who was also a witness in that case. McFadden approached Stewart, who was walking into the terminal after stepping off the bus. The officer identified himself and, speaking in a conversational tone, advised Stewart that

6

he was a police officer, showed Stewart his identification and explained why he had approached him. He asked whether he would search the bag Stewart was carrying, and Stewart replied that he could. Stewart placed the bag on the floor, and the officer stooped down on one knee to search it and found nothing but clothing. The officer then stood up and asked Stewart whether he had anything strapped to his body. Stewart responded in the negative, said "You can check" and lifted his shirt exposing his stomach area. The officer then conducted a pat down and found OxyContin pills in Stewart's back pocket. The Court concluded that Stewart did not consent to a full pat down and thus the motion to suppress was granted.

Here, the defendant expressed no reservation and gave no indication to the officers that he felt he had no choice. In response to Alvarado's question asking whether he could search the bag, the defendant said "Yeah" and handed the bag to the officer. In *Worley*, the defendant told the officers that since they asked to look in his bag, he had no choice but to allow the search. In *Stewart*, the facts are different in that the defendant gave consent to a limited search and that search went beyond the consent given by the defendant.

The Court finds by a preponderance of the evidence that the defendant voluntarily consented to the search and that he said nothing to the officers that would suggest that his consent was not voluntary. The motion is denied. It is hereby

**ORDERED** that the motion to suppress is denied.

DATE: June 2, 2006                                              **JOHN GARRETT PENN**
                                                                **United States District Judge**

Case 1:05-cr-00366-RCL     Document 28     Filed 06/02/2006     Page 8 of 8